Thank you, Your Honors, and may it please the Court. This case is very straightforward. The only question needed to address today is whether my clients were prevailing parties in their underlying action in the District Court. If they were, they are entitled to their reasonable attorney's fees, and the District Court was without discretion to deny their fee request wholesale. There's only two points I want to argue to that end. First, controlling precedent is clear. My clients were prevailing parties. And second, the District Court got it wrong when it determined they were not prevailing parties, and it relied on reasons that this Court has over and over again said are irrelevant to the prevailing parties. Sotomayor Tell me specifically what this order requires the State to do that they're not already obligated to do. Thank you, Judge Haynes. Sure. So in the stipulated order, there are three forms of relief that the plaintiffs obtained that they could not get from any kind of political relief, and that is that benefits had to issue by a specific deadline, January 22nd of 2016. That's not available under the regulations. When people's benefits are reinstated, that was specifically and only granted in the order. Second, the three-month limitation period was not allowed to commence for the putative class members. Typically, once benefits are reinstated, if class members or benefit recipients have already used up their three-month period, the next time a waiver is not granted, that clock starts to run again, and they would run out of benefits, having already accepted benefits for the three months within a 36-month period. They would run out of benefits immediately rather than wait? If they had used up their three months within the last 36 months, the next time a waiver was not granted and the work requirement was then reinstated, they would have already used up their three months. Okay, so it's kind of one three months per 36. Per 36 months. So you're saying that three months now isn't going to count against them, whereas it otherwise would have. Correct. Okay. Correct. When did you and your firm start representing these clients? The specific date when it was two non-profits that represented plaintiffs in the district court. I do not know off the top of my head the specific date that they started to engage and work with the plaintiffs, but it was all through the fall of 2015. Was it prior to the election? And it was prior to the election, so after Governor Jindal had announced that his administration was not going to seek the waiver in the middle of 2015, the question about what would happen to food stamp benefits arose. And plaintiffs, the non-profits, had then sought out what kind of legal relief could we obtain. They looked at administrative remedies, looked at due process claims, et cetera, knowing that benefits were potentially going to be running out in January. And the State of Louisiana even issued notices in September and December to the putative class members specifically stating your benefits will terminate January 1, 2016. And your predecessors were already legally representing them? Yes. So they began working up the case and were legally representing them in the fall, and then the action was filed on December 18th of 2015, just under about two weeks before the benefits were scheduled to terminate. Does this case seek attorney's fees for representing the non-profits? So under Grisham and Sanchez, both have stated that whenever a plaintiff, a prevailing party, loses on the motion for attorney's fees, and they have to then prosecute that issue on appeal, they are entitled to their reasonable attorney's fees on appeal as well. And these fees go to the plaintiffs, obviously, to cover their representation by the non-profits in the district court and then our representation here on appeal. Is there anything in the record of this case that shows how much is being sought for the non-profits? The non-profits put forward affidavits and have built out a substantial record on the motion for attorney's fees, and they're asking for $136,000 to cover those attorney's fees in representing the plaintiffs. All right. So the amount that's being sought is your firm's representation of the non-profits? No. I'm sorry, Judge Wiener. So the amount that's being sought is the $136,000, which represents the efforts of the non-profits and the attorneys in the district court, and that's on behalf of plaintiffs in filing the action and negotiating the settlement and obtaining the stipulated order. We have not put anything in the record, obviously, on our representation here on appeal. On remand, when it's time for the district court to calculate the reasonable fees. You've only represented the non-profits on appeal? Correct. Okay. I was confused on that. Correct. And we've taken this case on a pro bono basis. Okay. Okay. But I'm interested in the timing of the actual lawsuit filing. You said you all were, if you had filed this back in July or something when it was announced, that would make some sense. But you waited until Governor Bell Edwards was elected on November 21 to take office apparently on January 11, taking judicial notice of sort of the public knowledge of those. And your lawsuit's filed December 18, right there in the middle of all that. I'm not from Louisiana, as we've established, however, I'm aware that Governor John Bell Edwards isn't going to be a carbon copy of Governor Jindal and, in fact, ran on a platform of not being a carbon copy of Governor Jindal. That being the case, how can we say that your lawsuit, even if you achieved a change in status, wouldn't this be a special circumstance case where you didn't cause that because Governor Edwards was going to do that anyway? And, in fact, immediately said, hey, guys, I'm going to do that anyway. I'm not going to continue Governor Jindal's policies, which is exactly what I, Governor Edwards, have been saying for the last however long he was running. Yeah, so I can address that in two parts. First, kind of going through the timeline. So once Governor Jindal was phasing out, Governor Bell Edwards was elected, it was unclear what was going to happen with the waiver. And plaintiffs had, the non-profits were working on administrative, potential administrative relief and looking at the issues there. And once notices were received by plaintiffs saying benefits were terminating January 1 and it became definite and clear that that was going to happen, it looked like an all-out war was needed and a lawsuit had to be filed in December because Governor Bell Edwards had not announced any public position on what he was going to do with the waiver. So there was much uncertainty in November and in December. And so they put together the complaint. They had a motion for class certification, they had a motion for TRO preliminary injunction. Was there anything at all in his campaign rhetoric, his platform, anything he had done that would suggest he had an interest in cutting people's food stamps? I think that... To me, it seems very opposite to the platform he ran on, again, being very unexposed to that, but just the little bit that I know. Sure, I think it's probably clear that there was a general sense that Governor Bell Edwards was opposed to what Governor Jindal had done and wanted to potentially change the status of beneficiaries and make sure food stamps would come in future years, but these are only political promises. And as we know, political promises are never a guarantee. And once politicians come into office, there's things that can change. And they may not actually get the relief, they may wait and delay and get it much later. And so plaintiffs, in parallel with whatever was happening in the political sphere, filed their lawsuit and wanted to ensure that 20,000 people who were misclassified were not going to go hungry in January. All right. Does the record reflect what and when there was contact by the nonprofits or your firm with either Governor Edwards or his executive counsel? So there is a declaration from Seema Atri, one of the attorneys that was working with plaintiffs. I think the record site there is around 137, is part of that declaration. And she goes through and details some of the efforts they made on the administrative side. And there, essentially what's reflected from the record, and the record is a little bit limited on exactly what communication and correspondence took place, but what is reflected in the record is that there was a lot of uncertainty. There was never any promise made that benefits would be available through some form of political relief. And even at the time the lawsuit was filed, the two days before Governor Edwards then made his public announcement, the state's attorney represented that it was preparing for full battle. And shockingly, the state raised the white flag on Monday when Governor Bill Edwards made the announcement about the waiver. But up until that point, everything indicated, we have to fight this out. There's no guarantee on the political relief. We need to file a complaint. We need to make sure people are fed in January. And so that's what the plaintiffs did, and that's what the attorneys in the district court did. And the 100 plus attorney's fees is for different lawyers who represented the non-profits? These are for lawyers from the non-profits, Your Honor. So these are lawyers who took the case pro bono on behalf of the plaintiffs. These are public interest attorneys, and they had a team of attorneys working on the case for over a month, putting together a sophisticated due process claim, looking at the Food Stamp Act and the implementing regulations. In what time period was the bulk of this $136 utilized or used? November and December, Your Honor. And then after the complaint was filed, there was time spent negotiating and entering into the settlement order as well. Would you agree that if we were to agree with you that you're a prevailing party, we nonetheless would need to remand, not just for the amount of fees, which clearly would be the case, but also for the special circumstance determination? So, on the special circumstances, potentially you could remand and give the district court an opportunity to analyze that. It certainly was not addressed at all in the briefing below, was hardly addressed on the briefing before you, certainly not from the state. And so, and the district court did not purport to rely on it. But I think as we address in our briefing... It's lurking in this whole thing. Hey, this new governor was going to do differently. You didn't use perhaps the right language, y'all, collectively, but this was lurking in this whole case. I mean, it's what jumped off the page to me immediately is, okay, if Governor Dittle was going to be the governor the next year, I get all this, it's very clear. But we know there was going to be a change and perhaps even a fairly substantial one. And so, that's what hasn't made sense to me. So, that's been lurking in this case without it being required to be something that everyone made a big deal out of. Sure. And I think hindsight is 20-20 here. So, if you actually look, the — as I mentioned before, there were three forms of relief, specifically in the stipulated order, that could not have come from the political relief. And so, that's clear. And so, regardless of what's going on with the special circumstances, plaintiff's lawsuit clearly contributed to those three forms of relief, and there are reasonable attorneys' fees that ought to be awarded and associated with that relief. Second is, given the timeline, and as I said earlier, hindsight being 20-20, I think it's clear in the record that plaintiff's lawsuit directly contributed to the whole aspects of the relief. Everything indicated at the time the complaint was filed that benefits were going to terminate. In fact, beneficiaries had received notice saying specifically it was — they were going to terminate in January. And there was no indication, no guaranteed promise that any political relief would come. And so, on the causation point, the lawsuit was filed, then the announcement was made. The stipulated order was entered into before Governor Bell Edwards took office and before he even formally requested the waiver or it was granted. So that's setting that up. But even if we want to set those aside and look at special circumstances, as we've set out in our brief, and I'm prepared to argue if you'd like, the special circumstances did not contribute exception, does not — is no longer applicable within Fifth Circuit precedent. It's basically a dead letter, and I can go through that if you'd like, Judge Haynes. So the — the did not contribute special circumstance first arose in the Riddell case in 1980. And this Court was simply explaining what the legal standard was for attorneys' fees. And when it listed out the did not contribute special circumstance, it drew from two Eastern District of Virginia cases, both of which were reversed by the Fourth Circuit, eliminating what the district — the district court had relied on there, the did not contribute special circumstance, and undermining any support that Riddell had relied on to pull it into Fifth Circuit case law. Riddell itself did not even rely on the did not contribute special circumstance. It awarded attorneys' fees in that case and ignored the issue and did not even really address it on the facts. No case since Riddell in the Fifth Circuit has ever relied on the did not contribute special circumstance. It's never been used to outright deny fees or to justify that — that type of act. And then most importantly, the Buckhannon case in 2007, we believe, has entirely abrogated the did not contribute special circumstance. While it may be something you can look at in calculating reasonable fees, it can never justify an outright denial. Buckhannon looked at the catalyst theory, if you recall, and the catalyst theory was the idea that a party could still be considered to have prevailed for purposes of fee shifting, even if they didn't get a final judgment and even if they didn't get a consent decree, if they sufficiently caused voluntary change in behavior or some form of political relief. This is the catalyst theory. Buckhannon said, no, we're going to clean this up. We're going straight to the plain language of what it means to be a prevailing party. We're not going to look at the subjective intent of the defendant. We're not going to get into what's called a second litigation of significant dimension and try to figure out exactly who contributed to what. All we care about is did you get a final judgment or did you get a consent decree. While you're on the subject of final judgment, I'm sorry, I realize you're running out of time, and I wanted to ask this earlier. I have a little bit of a question about jurisdiction here, because it's not clear to me that there's been a final judgment. There was a settlement order entered, but it says you can come back and revive the suit if blah, blah, blah, and we don't know if the blah, blah, blah happened. We do know it happened, Judge. Okay. How do we know that? The order set up two parts. So first, if the waiver is granted, then all these additional obligations that are specific to this case and that we've achieved in the stipulated order are now live, and the State has to comply with these pieces. If the waiver was not granted in January, then plaintiffs could come back and continue to further their obligations. Where in the record does it show me that the, I assume the waiver was complied, obtained, and all of that, the State did what it was supposed to do, but where is that in the record? I do not have a specific site for you on the waiver being granted, Judge Haynes. I can look at it during my time while Appleby is arguing and come back with a site for you on that. But you're telling me, as an officer of the court, that happened, the waiver was granted, the State's done its part, we're done, there's nothing more for the district court to do, and therefore this is the only issue still alive? Yeah, the only issue that's lingering in this case is the motion for attorney's fees. If that weren't the case, would there be, would this be under the collateral order rule? What would be the appellate basis if the record does not show us a final judgment? So if there, if the waiver was not granted, we would not be here. There would be no motion for attorneys. No, I'm saying, I'm not, that's not my, my question's more specific. If the record doesn't show us what happened, the record just leaves us on January X, 2016, and we don't know what happened, which is kind of where we are, then what would give us jurisdiction over the attorney's fees question? Collateral order rule, is there something else? I mean, that's what I'm asking. I have not thought specifically on that issue, Judge Haynes. Let me reflect on it and, and come back with a potential answer. Okay, thank you, sir. Thank you, Your Honors. Ms. Williams-Alexander. Good morning, Your Honors. Celia Alexander for our former Secretary, Susie Sonnier, and currently Marquita Warner, Warner serves as our current Secretary and was appointed under Governor Bill Edwards. One thing I want to just kind of put at the forefront before we start is counsel's statement that political promises are never a guarantee, and then I'm going to go through a little brief argument, and we're going to come back to that. The issue before the Court, again, is narrow. The only question before this Court is whether or not the lower court erred in denying attorney's fees in this matter. I'm sorry, do you mind addressing the jurisdiction while that's still in my head? And so the question is, I don't see in the record, and I could stand corrected by either of you, a final judgment that leaves nothing for the Court to do but implement the judgment. I see an either, or, if, but, whatever. Practically speaking, I agree. Probably we would have heard more, you know, yelling if, if things had fallen apart. But I don't see anything in the record that shows that happened. So do we have jurisdiction over the attorney's fees order under the state of the current record, or do we not, and if you could answer that. Your Honor, I haven't thought about that question, but in listening to some of your statements earlier, I had an issue previously with the case being brought in that I thought this was a judicial, I mean, excuse me, administrative remedy that should have been solved by the individuals who would have been affected. Oh, right. I know that. I'm talking about appellate jurisdiction. But the appellate jurisdiction, Your Honor, I think it's still open-ended. I agree with you. It was an either, or. You know, if we fail to obtain the waiver, then plaintiffs had the right to come back into court and proceed with their action. It's open-ended. There's nothing in the record to reflect that DCFS obtained the waiver, which the feds did grant the waiver, and, of course, you didn't hear the yelling and the screaming, and it brings us to the motion for attorney's fees. So I don't believe there's anything that we would have in the record that reflects that. So is the attorney's fees a collateral order that can be appealed even if there's no evidence of a final judgment? I think so, Your Honor. Okay. I think so. All right. I'm sorry. Go ahead and talk about that. That's okay. Well, where I was at is, again, with the issue, and the Court is aware of what that issue is. If the lower court denied the attorney's fees, basically, they're saying that plaintiffs are not the prevailing party, and that is what the judge ruled in the district court. Simply put, there were terms in the stipulations agreed to by the parties as a result of the filing of the plaintiff's complaint is what the plaintiffs would have you contend, that the plaintiffs would contend. But what DCFS contends is that there were already irons in the fire at the time that the suit was filed. The timeline itself, as you've addressed, is a really brief, quick timeline. There was a quick turnaround on everything. The timing of the filing of the litigation. I thought there was something in the complaint that pointed to Ms. Romaine actually coming in maybe a month prior to the filing of the suit. The litigation counsel says that there was preparations in the early months. Most advocacy groups, not that they're required, generally approach the agencies. We get it all the time with the Advocacy Center or some of the other justice centers. They normally approach the agencies before incurring some type of litigation, because generally, our interest is to serve our clients. We serve an indigent population, and generally, long litigations are not to the benefit of either. The department has a program to run, the SNAP program, the Food Stamp program, which is that issue. And of course, they have plenty of plaintiffs they need to represent with regards to other issues that are pertinent to that demographic. So with that being said, we have a promise that was put into a stipulation, and that promise was based or hinged on a third party. That third party or that unspoken party is the federal government. It's the USDA, our Food and Nutritional Service Division. And should they have not granted that waiver, then all of this falls apart. So all of this was predicated not on the plaintiff's suit, not on their actions. It was predicated on whether or not John Bel Edwards, the governor-elect, not even sworn in, his intentions put forth in a letter, his conversations and communications between the agencies and with the federal government that brought this to fruition. Now, that it was reduced to what became part of this stipulation is incidental. What occurred prior to led up to the steps of the governor, it was being able to enter into this agreement or allow the agency to enter into this agreement. And as you're aware, the waiver is something that only the governor of the state can agree to. So the secretaries are appointed. And as you do know, that former Governor Jindal did not elect to renew the waiver. This waiver had been in place for about 18 years. We've seen it in both, whether it was a Republican or a Democratic governor in the office, we've seen this waiver renewed constantly. And with the agenda that was in place at the time, it was known to the public, it was in the media. New Orleans saw its own protest months, maybe two months prior to the filing of the litigation, where it was known by other advocacy groups that the state would not be renewing the waiver. It had been put out. Recipients had received notices in September, they received them in December. So there's one of the other things, and counsel may not be aware of this, but you are dealing with recipients who all have certified cases that renew at different times. So these notices that he speaks of are not the only notices that would have been received. These individuals have cases that are being certified constantly. Let me ask you this. If we were to conclude that a change in legal status did take place as a result of this lawsuit, but we were to conclude that the special circumstances exception is still alive and well and living in the Fifth Circuit, what evidence would you present on special circumstances? I mean, what are we looking for in a case like this when we have a change in governorships and so forth? What evidence would support the notion that the new governor would have done this anyway? Well, I think it goes back to one of the things you spoke of, his platform. We had a governor that made it known that he was definitely the polar opposite of the outgoing governor. Is it enough to just say, I don't like what Governor Jindal does, or does he have to be specific on this, and would you have to bring forth evidence? Because we don't want judges just relying on what they read in the paper, or saw on the news, or on the internet, or whatever, because there's a lot of stuff out there in the world that may or may not be accurate. What evidence would you present, or would need to be presented, for the judge to be able to rely on and say, yes, the governor would have done this anyway, even without this lawsuit, the new governor? Well, I think it would have to boil down to whatever communications we could actually release that were exchanged between the agencies, that were exchanged between the governor-elect at the time and the federal government. Those that were not privileged would actually have to be, would probably be the only thing that we could proffer to show evidence of that. If we're looking for your black and white, if we're looking for hard copy, then that's what we'd have to look to. The fact that the governor-elect, the propaganda that was put out by the media, and his intentions that were actually put in writing to the feds that were made a part of the stipulation, in part, and actually made a part of the pleadings. Those are our only black and white that we have that we see reduced to writing. Other than that, we really would have to go, you know, behind closed doors to put forward what the governor's intentions were at that time. All right. Can you point to me where in the existing laws and statutes all of the things that are in the order, the January order, are already required? In other words, you have to prove the opposite of what he's saying, there was a change in legal status because you were, you're, the state is now required to do things it wasn't previously required. So now I'm asking you, if you're saying now it's no big deal, we're already required to do it, can you point to me where each of the things that's in the order are already required of Louisiana? Well, one of the things he pointed out was the timeline. I think the January 22nd timeline, had it not been for the lawsuit, maybe that January 22nd deadline would not have been put in place. Well, in fact, when applying for waivers, then one of the things that the agency looks to do is to take care of back payments. You want to make sure that your recipients are made whole. You want to do it as efficiently as possible and without errors. When you're serving over 400 and some-odd thousand food stamp recipients per month, then it does take time within the system, but pretty much when we have what we call mass changes, then we do these on a regular basis. So it's not something new for the agency. So that timeline of January 22nd is not something that the agency was without doing on its own. The federal government requires, or excuse me, 7273, Your Honor, I think, and I can check that just to make sure, but 7 CFR 273 speaks to the rights that our recipients are entitled to. It goes into our fair hearings. It talks about our notices and what's required of them, what actions the agency should take within a period of time. If there's an error made by the agency, then you have the 30-day corrective action that needs to be made. Here, there wasn't an error made by the agency, but that's just to give you an idea that those timelines are there. And again, when we have mass changes, which take place every January, you see changes in income regarding Social Security income. And a large amount of these recipients were SSI, Social Security, et cetera. Those incomes fluctuate, usually they increase by a couple of dollars. You'll see a mass change. Those mass changes are reflected with certifications on our end, they're reflected with renewals on our end. Sometimes it puts an individual where they're receiving $8, now they're receiving $12. If they're receiving $24, now they're receiving $10. It depends on what that increase was. It depends on whether or not there was a change with their HUD and their approval for their monthly rentals and things of that nature. So mass changes are not new to the agency. It's something- And you're saying those are dealt with promptly anyway. Yes. So the timelines are there. Yes. Okay, what about this issue of the three months being used up, but now being restored under the order? How do you respond to that? I would say in being a Deputy General Counsel at DCFS for our Economic Stability Program, food stamps falls under that program. And what I would implore to you is that when we actually do a waiver, or if we had something that was a mass change, then the three months, in this instance, were not going to be counted against the individuals. And here's the fact, the pivoting point. The individuals that were part of this 62,000 that were listed, of that 62,000, I think it's 31,470 of them as of December 1 who had received letters, had applied for the higher program. They met an exclusion, and the exclusions, they were outside the age limit. So they were not required to, they were no longer, they were excluded from that group that would be dropped or taken off the food stamp program. The individual, if they were pregnant, they were going to be excluded. So there are a lot of factors that played into the role that one, it would reduce those numbers of individuals that were listed or claimed in the plaintiff's complaint. Those who are physically ill, mentally fit for employment, et cetera, those, that doesn't even require some medical diagnosis of a disability. It just says a serious illness, is what our law requires. So there were factors that were going to play in, that were going to automatically reduce those individuals who would actually fall within that three-month ban. And but again, once we applied for the waiver, the intention was not to, not to utilize that ban, not to use it up, because you want that individual. Where is that written down, or where could, if I were an applicant, and I was in the middle of the three months when all this came about, and now down the road, I'm going to need to apply and I need those three months back, what would have prevented you all from going, hey, you've already used, you know, two and a half months, you only have two weeks, have a nice day? They used two and a half months as a result of the waiver not being applied. In this 2015, turning into 2016 timeframe, I, the food stamp applicant, used up two and a half months. Now down the road, I need to apply again within the 36 months that he mentioned. What would prevent you, what law, rule, regulation, policy would prevent you from counting those two and a half months against me? Well, if you were within that two and a half months prior to the January intended effect date, then you were already under these guidelines, and we had a waiver in place. If you actually receive a notice of closure, then this is where your due process comes in. We have administrative hearings for that fact, the fair hearing process, they have a hearing, and then within that hearing period, and generally, when I request a fair hearing after I receive my notice, you're going to get a review. That review can be automatic, and that caseworker can look at your case, and then you wouldn't have to go through the process, they can on their own go ahead and reinstate your fees. If there's not a renewal, certification, change in employment, different types of expenses or deductions or changes, then those processes are still in place. We still have the criteria that what we call our daily work is still going on, so the three month period, not counting against the individual would have been caught at so many levels within the normal process. Yeah, I'm just asking, and you know, look, you know this process a lot better than I do, I'm not going to doubt that. I'm just trying to hone in on a really specific question. Your opponent has given me a list of things that he says, this was the change in status that makes us prevailing parties, and I'm trying, and you're saying, nah, no big deal, so I'm trying to hone in on that and say, what shows me, I understand that maybe just out of the goodness of your heart, y'all wouldn't have counted and all that, but that's not good enough. I'm saying, is there a policy, a rule, a regulation you can point to and say, if somebody's in the middle of their three month, but then a waiver is granted, we wipe out that three months and start over again, then that would be helpful, and that's what I'm asking for, very specifically. Can you point me to something in the world that I can look at and go, oh, that really wasn't a change in status because they would have gotten it anyway. Well, and Your Honor, I would love to point you to something that says if a waiver's not granted, but because waivers are discretionary and not mandatory, there's nothing in our state that applies for a waiver, and then the waiver's granted, and there's- Is there something in the state's rule, I mean, is there anything you can, other than just your own affirmation of how things are done, can you point me to any guidance, guideline, policy, memo, I mean, anything? Your Honor, I honestly couldn't. Our DCFS policy doesn't address waivers. Usually waivers are applied for, and if they're applied for, they're granted, and then you continue on with your normal process, so none of your policies are predicated upon the waiver. If a waiver is applied for and it's granted, your process continues. If a waiver's applied for and it's not granted, then you're back to what was already in place, and out of all the states, I think at that time, if I'm correct, I think there were about 18 who had waivers in place. So the majority of them had already started the ABOD process and removing those from the roles who were past their three months, et cetera. So then, if there is nothing, then how can you tell me they did not achieve a change in status by the waiver? How can I tell you that the waiver- No, I'm saying, he's given me a list, I've asked you to rebut the list, on this one you said you couldn't do it, so then I'm saying, doesn't that prove that they achieved a change in status by this order? Your Honor, I still would say no, in that the plaintiff still relied on the very statement of our governor saying, I'm going to apply for a waiver with the feds, my intentions are to move forward with not, in effect, not putting in place the three-month period and counting it against the individuals. Were there not people who were already in the middle of the three-month when this happened? Yes, Your Honor, there were. I'm trying to understand what happens to them. Those individuals who are within the three months, they fall under what would be our If they had something that would exclude them from having to apply for I-Hire or apply for a registration with the Department of Labor, then they would go through the normal process. If they hit their three months before the January 1 date, they receive a notice of closure. And this is assuming that there wasn't a waiver granted. They would receive their notice of closure. That notice of closure gives them their fair hearing process and how long they have to actually provide information regarding whether or not they've sought employment, whether or not they're mentally unfit, are they outside the age of 18 to 49, are they pregnant, do they have someone that's in the SNAP household who is a child and under the age of 18. So those processes are in place, those policies are in place, those federal laws, those statutes are still there. So if they were within their three months and a waiver was not granted, again, predicated on the waiver. If that waiver was not granted, then that individual receives a notice of closure. They are told what their rights are. And if they meet any of these exclusions, then right then, the three months don't apply to them. They fall within the exception. And that's all if there's not a waiver granted. Your Honor, just in closing, real quick. Plaintiffs would have one to believe that the fact of performance obligation being contingent upon the USDA FNS was a relevant factor. However, it is very, the very door upon which the stipulations hinged upon. The appellants themselves state how much interest they have vested in the stipulation in a reply brief. On page two, saying to the effect, and at all points, appellants have relied on the very evidence needed to show that they prevail. And in that instance, they were appointing to the stipulation as their means of prevailing. And again, that stipulation was predicated on the solid party, which is the federal government and the waiver being approved in the intent of our governor. Thank you, Your Honor. Mr. Sink, you have five minutes. I'll try to briefly address some of the points that the state raised and to address your questions as well. First, I do want to point out that under Grisham, even if the relief we obtained is exactly the same as the political relief, the fact that it was enshrined with judicial imprimatur in a consent decree means that we contributed necessarily. And that's what Grisham explains when it's even going through this analysis. Yeah, but if the order only said the state of Louisiana has to follow the law, I'm not sure that putting that in an order does anything because they're already required to follow the law. That was the reason for my colloquy there we had just a minute ago. So this is exactly what Grisham talks about. And this is why the district court outright denied fees in Grisham, is because it thought that the relief was nothing special, nothing in addition. It just said you have to comply with the plaintiff's First Amendment rights. And Grisham said no, the fact that you can come back and you have a quick avenue for obtaining relief if they violate a consent decree in a stipulated order, file a motion to contempt, seek sanctions, etc. Instead of having to file an entire new lawsuit to address the issue, that in and of itself necessarily changes the relationship between the parties. And so I do want to address that point. On the jurisdiction issue, Judge Haynes, I do know for a fact that the waiver was requested and was granted by the federal agency. We have copies of those documents. I do not believe it's in the district court record. But we can follow up with a 28J, and I think the court can take judicial notice of that fact. So we can address those in a 28J. On the issue of what evidence that the state would need to bring to show special circumstances apply, I do want to remind the court that under Sanchez, it requires an extremely strong showing. The discretion to outright deny fees on basis of special circumstances is exceedingly narrow. And what's required is the state has to show not that we were not the primary cause of the relief obtained, but that we did not at all contribute. And I think the record very clearly reflects, not only did we obtain a consent decree, which the only way to get that is through a lawsuit, but we also got specific forms of relief that we directly contributed to. Let me ask you something there. Yes. Suppose we agree that there was error in denying fees, and we remand. Can we do so without including for the district court to consider special circumstances? Or has that been waived because there was no mention, is my recollection, about special circumstances? Or did they just not reach it because of his, of the district court's decree? Yes, Your Honor. So, I believe that on remand, the district court should not have discretion to consider special circumstances. They were never raised. The state abandoned any argument on that before the district court. It had its chance to raise it then, and it did not. And it's the state's burden to show that they apply. So, if there's a reversal on prevailing party status and a remand for calculation of fees, special circumstances doesn't- The attorneys didn't contribute to the prevailing. Your Honor, so if you look at the district court's order, it specifically says that although a finding of prevailing party status is warranted in certain circumstances, it's not warranted here. And that's just wrong under the Brightline rules. Prevailing party status is an entirely separate inquiry that looks at the plain meaning of the term in the statute. And none of this stuff about contribution, causation, significance of relief is relevant at all to that question. Does the party have to use the magic word special circumstance, or is it enough that these points about Governor Edwards and so on were argued? So, there we have two cases we cited, Houston Chronicle, and I'm blanking on the other case in our brief. And both of these explain that the district court at the very least has to specifically mention and identify what it considers to be special circumstances. No, I understand that. But, I mean, you're arguing the court just completely messed up the framework here. Correct. So that's a different argument from whether – I'm not saying the judge has already found a special circumstance. Judge Wiener specifically asked about waiver. And I'm saying, is it necessary for a party to say magic word special circumstances, or is it enough that they argued the very points that would be relevant to special circumstances, so that if we're saying the judge messed up the framework, we send the whole framework back and go, here's how you do prevailing party, here's special circumstance, you know, start over, judge, and here's the rules. Wouldn't that be the right way to handle it if we agree with you that there was a problem in the framework the judge used? These arguments about Governor Edwards and what he would have done and all that aren't new. I didn't make them up. They're in the record. So is it necessary to use the phrase special circumstances, or is it enough that the facts were argued? I don't think the facts were sufficiently argued. There was nothing in the record, no evidence put forward by the State on special circumstances. There was no affidavit from anyone within the State of Louisiana saying this is why we decided to settle, these are the reasons we settled, this is why we gave certain relief, this is why we sought the waiver. There's just nothing in the record on that. And it hasn't been sufficiently addressed at all, regardless of whether it's a question of did you mention it. They didn't even put forth any facts on the real issue. They simply talked about what was happening in the political sphere, which we think is irrelevant. For these reasons, Your Honors, we ask that you would please reverse on the issue of calculate reasonable attorneys. I'm sorry. You said it's irrelevant what's happening in the political sphere. I mean, would it not be relevant to point to what the then-candidate, Governor John Bel Edwards, was arguing and saying? I mean, would that not be relevant? Again, Your Honor, I think it's 20-20 hindsight. The lawsuit was filed before any formal announcement was made. The announcement was made three days after the lawsuit was filed. Also, as I said earlier under Grisham, even if there's a parallel track of political happening, these are only political promises. They aren't solidified in any kind of court order. And Grisham says when you get a consent decree, the fact that it's enforceable by a motion for contempt or sanctions necessarily changes the legal relationship of the parties, even if it tracks exactly with what you're entitled to under law. Thank you, Your Honors. All right. That concludes our arguments.